**SIERRA CLUB, the City Club of New York, Business for Mass Transit, Committee for Better Transit, Inc., NYC Clean Air Campaign, Inc., West 12th St. Street Block Association, Hudson River Fishermen's Association, Hudson County Citizens for Clean Air, Seymour Durst, Otis Burger, Mary Rowe and Howard Singer, Plaintiffs-Appellees-Cross-Appellants,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, John Marsh, as Secretary of the Army of the United States, Joseph K. Bratton, as Chief of Engineers, Walter M. Smith, Jr., as New York District Engineer of the United States Army Corps of Engineers, William C. Hennessy, as Commissioner of the New York State Department of Transportation, United States Department of Transportation, Andrew L. Lewis, Jr., as Secretary of Transportation of the United States, Federal Highway Administration, and Raymond A. Barnhart, as Administrator of the Federal Highway Administration, Defendants-Appellants-Cross-Appellees.**

Nos. 473, 475, 476, 522, 523, 524, Dockets 82–6125, 82–6145, 82–6149, 82–6183, 82–6193 and 82–6195.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1982.

Decided Feb. 25, 1983.

Albert K. Butzel, New York City (Mitchell S. Bernard, Butzel & Kass, New York City, on brief), for plaintiffs-appellees-cross-appellants Sierra Club, et al.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City (R. Nicholas Gimbel, Gaines Gwathmey, III, Thomas D. Warren, Asst. U.S. Attys., New York City, on brief), for defendants-appellants-cross-appellees U.S. Army Corps of Engineers and Federal Highway Admin.

Milton S. Gould, New York City (Bernard D. Fischman, Shea & Gould, New York City, Darrell Harp, Michael McDonald, Albany, N.Y., Gary H. Baise, Jonathan Z. Cannon, Karl S. Bourdeau, Beveridge & Diamond, Washington, D.C., on brief), for defendant-appellant-cross-appellee Hennessy.

Before OAKES, MESKILL and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

These are appeals by state and federal defendants and a cross-appeal by plaintiffs Sierra Club, *et al.* ("Sierra Club"), from judgments of the United States District Court for the Southern District of New York, Thomas P. Griesa, *Judge,* upholding in part plaintiffs' challenge to the federal defendants' approval of Hudson River landfill in connection with a proposed New York City highway known as "Westway." The court ruled that defendants United States Army Corps of Engineers (the "Corps") and Federal Highway Administration ("FHWA") had violated the National Environmental Policy Act, 42 U.S.C. § 4332 (1976) ("NEPA"), and that the Corps had violated the Clean Water Act, 33 U.S.C. § 1344 (Supp. V 1981), and § 10 of the Rivers and Harbors Appropriations Act of 1899, 33 U.S.C. § 403 (1976) ("Rivers and Harbors Act"), by making inadequate investigations and disclosures concerning the impact of the Westway landfill project on fisheries in the Hudson River. The court enjoined further construction of the project pending reconsideration by FHWA and the Corps in compliance with the statutes, ordered special record-keeping in connection with the reconsideration, and appointed a special master to supervise compliance. FHWA, the Corps, and defendant William C. Hennessy as Commissioner of the New York State Department of Transportation ("NYSDOT") challenge various aspects of these rulings. In its cross-appeal Sierra Club seeks reversal of so much of the district court's decision as found the Corps, in other respects, in compliance with NEPA, the Clean Water Act, and § 9 of the Rivers and Harbors Act.

For the reasons below, we affirm the district court's judgments except insofar as they (1) upheld plaintiffs' claim that the Corps had violated § 10 of the Rivers and Harbors Act, (2) required FHWA and the Corps to include in a supplemental environmental impact statement current information on nonfisheries issues, (3) prohibited FHWA and the Corps from acting as joint lead agencies in preparing a supplemental environmental impact statement, and (4) appointed a special master.

## I. FACTS

The background of the present litigation is more fully set forth in two opinions of Judge Griesa, reported in *Action for Rational Transit v. West Side Highway Project,* 536 F.Supp. 1225 (S.D.N.Y.1982), *see* note 14 *infra,* and *Sierra Club v. United*

*States Army Corps of Engineers,* 541 F.Supp. 1367 (S.D.N.Y.1982). Familiarity with both opinions is assumed. Except to the extent indicated, the following statement of facts reflects findings of the district court or evidence of record as to which we see no substantial dispute.

## A. *Initiation of the Westway Project, the Draft EIS, and the Criticisms*

"Westway," the currently proposed Manhattan highway intended to replace the southernmost portion of the deteriorating West Side Highway, had its origins in a 1971 agreement reached among New York City, New York State, and FHWA in connection with major revisions of the interstate highway system in the New York metropolitan region. The plan began to take shape in 1972, when the State and the City jointly established an administrative entity called the "West Side Highway Project" (the "Project") under the jurisdiction of NYSDOT to plan the replacement for the West Side Highway. The Project was comprised almost entirely of outside consulting firms, the chief of which was Systems Design Concept, Inc. ("Sydec"), whose principal, Lowell K. Bridwell, was Executive Director of the Project from 1972 until 1981.

Beginning in 1972, the Project spent many months developing policy statements and goals to use in planning the location and design of the replacement highway. At some point it became apparent that construction of the replacement highway would require preparation of an environmental impact statement ("EIS") pursuant to § 102(2)(C) of NEPA,[1] to describe the environmental consequences of the construction. The staff and consulting firms associated with the Project prepared, within their respective areas of expertise, draft sections of such a statement. Sydec assembled all of the sections in a single draft, and submitted it to NYSDOT and FHWA for review.

On April 25, 1974, a formal draft environmental impact statement ("DEIS") was issued, signed by NYSDOT and FHWA, presenting five alternative plans for the replacement highway and analyzing the alternatives in terms of community needs and environmental concerns. The DEIS discussion of the replacement highway's expected impact on fisheries in the Hudson River was based on a 1973 biological survey conducted by one of the Project's consulting firms. It concluded that the interpier area was populated only by relatively few species of fish (tomcods) and invertebrates. In accordance with 40 C.F.R. § 1500.7(a) (1974), the DEIS was circulated for public comment.

Most of the responses to the DEIS related to an alternative referred to as the "outboard" alternative, which included a proposal for the highway to be built on landfill between bulkhead and pierhead lines (the

---

1. Section 102(2)(C), 42 U.S.C. § 4332(2)(C) provides as follows:

 (2) all agencies of the Federal Government shall—

 . . . .

 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

 (iii) alternatives to the proposed action,

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes.

"interpier area") on the river. Three federal agencies submitted comments to NYS-DOT. The National Marine Fisheries Service ("Fisheries Service") informed NYS-DOT that it did "not believe that the statement provide[d] sufficient information to permit a valid assessment of probable environmental impacts," particularly with respect to marine resources. The United States Federal Wildlife Service ("Wildlife Service") and Environmental Protection Agency ("EPA") also submitted comments which focused tangentially on marine impacts.[2]

Following issuance of the DEIS and the Project's receipt of comments, city agencies, with Project support, reviewed the outboard alternative and recommended the construction of a modified version of that alternative. This recommendation was approved by the Governor and the Mayor on March 7, 1975, and Westway was the name given to the approved alternative.

B. *The Final EIS*

After publication of the DEIS, the Project reevaluated the alternatives and completed further engineering and environmental studies. The environmental studies included a Technical Report on Water Quality ("Water Report") based on the same 1973 fisheries data that had been used to formulate the DEIS's discussion of the project's impact on fisheries. The Water Report stated that relatively few species of fish could tolerate the existing conditions of the interpier area and that, although the area might be used to a limited extent in migration, modern-day pollution made the area a "biological wasteland."

After receiving the comments on the DEIS, the Project staff reevaluated the

outboard alternative and prepared a new document, as required by 40 C.F.R. § 1500.-7(a) (1974); *see also* NEPA § 102(2)(C), incorporating the comments and its responses to them, to become part of the final environmental impact statement.[3] The final environmental impact statement ("FEIS" or "January 1977 EIS") recommending Westway, signed by NYSDOT and FHWA, was issued on January 4, 1977.

The FEIS analyzed the Westway alternative as it related to, *inter alia,* the quality of urban development, traffic patterns, air quality, noise, water quality, and the impact of the proposed landfill on the aquatic habitat of the interpier region. Noting that the interpier area was "biologically impoverished," the FEIS stated that Westway would create an estuarine habitat in the interpier area that

> will closely resemble that of the main channel. The inter pier basins are presently almost devoid of macro organisms, and therefore the landfilling of the basins will cause a minimal loss of estuarine productivity for species other than micro organisms. Since the inshore area is biologically impoverished, the placement of landfill will have little impact on the overall productivity of the Hudson estuary. As noted earlier in this discussion, future dissolved oxygen levels throughout the Lower Hudson are expected to improve substantially with the complete implementation of wastewater treatment programs. This improvement will provide an attractive habitat for more diverse and numerous estuarine species in future years.
>
> . . . .
>
> Fluctuations in salinity along the Modified Outboard edge would be much less

2. The Wildlife Service comment questioned the sufficiency of the statement regarding the impact of the project on parklands, and stated that it felt the outboard alternative would have a positive impact on land-dwelling wildlife in Manhattan that should be noted in the EIS. Air pollution was the primary concern of EPA, but that agency was troubled also by other aspects of the project including relocation of sewers, which would have impact on both navigation and fisheries. EPA stated that the DEIS

"discussion of the project's impact on water resources is deficient such that an opinion as to the project's impact in this respect cannot be rendered."

3. It also evaluated the possibility of a trade-in of interstate highway funds for mass transit funds, an option that had become available as a result of § 103(e)(4) of the Federal Highway Act of 1973, 23 U.S.C. § 103(e)(4) (1976).

severe than the changes now occurring in the inter pier basins. The layering of fresh, brackish, and salt water which characterizes the main channel will also apply to the Modified Outboard shoreline. The rise and fall of these layers caused by tidal action will be gradual enough to permit shore migrations along the edge for species requiring a stable habitat. The preferable edge treatment for the Modified Outboard shore would be riprap because it can provide a greater variety of dwelling areas and can attract more species, both those resident along the edge and fishes which feed on these creatures.

The Water Report, which had similarly described the interpier area as a "biological wasteland," was appended to the FEIS.

Like the DEIS, the FEIS had been drafted by Sydec, under the supervision of Brid-

well, and had been reviewed by FHWA. FHWA administrators testified, however, that either they had been unaware of the Fisheries Service's comment that the fisheries information in the DEIS was inadequate, or they had considered the matter unimportant in relation to other Westway concerns.

On January 4, 1977, the day the FEIS was issued, FHWA approved federal funding for Westway. FHWA design and location approvals were issued soon thereafter.

## C. The Application for a Landfill Permit, the Federal Agencies' Opposition, and the New Fisheries Data

Because Westway would require landfill in the Hudson River, approval was required from the Army Corps of Engineers pursuant to § 404 of the Clean Water Act,[4] and

4. Section 404 of the Clean Water Act, 33 U.S.C. § 1344 provides, in pertinent part, as follows:

§ 1344. Permits for dredged or fill material
(a) Discharge into navigable waters at specified disposal sites

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

(b) Specification for disposal sites

Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary of the Army (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

(c) Denial or restriction of use of defined areas as disposal sites

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specifica-

tion) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

(d) Definition

The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

. . . .

(m) Comments on permit applications or proposed general permits by Secretary of the Interior acting through Director of United States Fish and Wildlife Service

Not later than the ninetieth day after the date on which the Secretary notifies the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service that (1) an application for a permit under subsection (a) of this section has been received by the Secretary, or (2) the Secretary proposes to issue a general permit under subsection (e) of this section, the Secretary of Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such application or such proposed general permit in writing to the Secretary.

. . . .

§ 10 of the Rivers and Harbors Act.[5] On April 7, 1977, NYSDOT applied to the Corps for a permit. On April 22, 1977, the Corps issued a notice of public hearing on the application, thereby beginning the "public interest review" process required under the Clean Water Act prior to a Corps decision on whether to issue the permit. *See* 33 C.F.R. § 320.4(a) (1981).[6] The Corps notice also announced that FHWA was to be considered the "lead" federal agency in the project, *see* 40 C.F.R. § 1500.7(b) (1974),[7]

(q) Minimization of duplication, needless paperwork, and delays in issuance; agreements

Not later than the one-hundred-eightieth day after December 27, 1977, the Secretary shall enter into agreements with the Administrator, the Secretaries of the Departments of Agriculture, Commerce, Interior, and Transportation, and the heads of other appropriate Federal agencies to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section. Such agreements shall be developed to assure that, to the maximum extent practicable, a decision with respect to an application for a permit under subsection (a) of this section will be made not later than the ninetieth day after the date the notice of such application is published under subsection (a) of this section.

. . . .

5. Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 (1976), provided as follows:

§ 403. Obstruction of navigable waters generally; wharves, piers, etc.; excavations and filling in

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

6. 33 C.F.R. § 320.4(a) provides as follows:

(a) *Public interest review.* (1) The decision whether to issue a permit will be based on an evaluation of the probable impact of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process (e.g., see 33 CFR 209.400, Guidelines for Assessment of Economic, Social and Environmental Effects of Civil Works Projects). That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered; among those are conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people. No permit will be granted unless its issuance is found to be in the public interest.

(2) The following general criteria will be considered in the evaluation of every application:

(i) The relative extent of the public and private need for the proposed structure or work;

(ii) The desirability of using appropriate alternative locations and methods to accomplish the objective of the proposed structure or work;

(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work may have on the public and private uses to which the area is suited; and

(iv) The probable impact of each proposal in relation to the cumulative effect created by other existing and anticipated structures or work in the general area.

*See also* notes 8 and 9 *infra.*

7. 40 C.F.R. § 1500.7(b) set out guidelines to be followed where more than one federal agency was involved:

(b) Where more than one agency (1) directly sponsors an action, or is directly involved in an action through funding, licenses, or permits, or (2) is involved in a group of

and that the FEIS that had already been published had been reviewed by the Corps and was adequate for Corps purposes.

The public interest review procedures require the Corps decisionmakers to consult with, and give great weight to the views of, Fisheries Service and Wildlife Service, *see* 33 C.F.R. § 320.4(c) (1981),[8] and to coordinate with EPA, *see* 33 C.F.R. § 323.5 (1981).[9] Within the Corps, the initial decision would be made by the district engineer; objections by other federal agencies could lead to successive reviews by the division engineer, the chief of engineers, and the Assistant Secretary of the Army. *See* 33 C.F.R. § 325.8 (1981).[10] Following the

actions directly related to each other because of their functional interdependence and geographical proximity, consideration should be given to preparing one statement for all the Federal actions involved (*see* § 1500.6(d)(1)). Agencies in such cases should consider the possibility of joint preparation of a statement by all agencies concerned, or designation of a single "lead agency" to assume supervisory responsibility for preparation of the statement. Where a lead agency prepares the statement, the other agencies involved should provide assistance with respect to their areas of jurisdiction and expertise. In either case, the statement should contain an environmental assessment of the full range of Federal actions involved, should reflect the views of all participating agencies, and should be prepared before major or irreversible actions have been taken by any of the participating agencies. Factors relevant in determining an appropriate lead agency include the time sequence in which the agencies become involved, the magnitude of their respective involvement, and their relative expertise with respect to the project's environmental effects. As necessary, the Council [on Environmental Quality, *see* note 22 *infra*] will assist in resolving questions of responsibility for statement preparation in the case of multi-agency actions. Federal Regional Councils, agencies and the public are encouraged to bring to the attention of the Council and other relevant agencies appropriate situations where a geographic or regionally focused statement would be desirable because of the cumulative environmental effects likely to result from multi-agency actions in the area.

8. 33 C.F.R. § 320.4(c) provides as follows:

(c) *Fish and wildlife.* In accordance with the Fish and Wildlife Coordination Act (§ 320.3(e) above) Corps of Engineers officials will consult with the Regional Director, U.S. Fish and Wildlife Service, the Regional Director, National Marine Fisheries Service, and the head of the agency responsible for fish and wildlife for the state in which the work is to be performed, with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application. They will give great weight to these views on fish and wildlife considera-

tions in evaluating the application. The applicant will be urged to modify his proposal to eliminate or mitigate any damage to such resources, and in appropriate cases the permit may be conditioned to accomplish this purpose.

9. 33 C.F.R. § 323.5 provides in pertinent part as follows:

(a) *EPA Guidelines.* Applications for permits for the discharge of dredged or fill material into waters of the United States will be reviewed in accordance with guidelines promulgated by the Administrator, EPA, under authority of Section 404(b) of the Federal Water Pollution Control Act. (See 40 CFR Part 230). If the EPA guidelines alone prohibit the designation of a proposed disposal site, the economic impact on navigation and anchorage of the failure to authorize the use of the proposed disposal site will also be considered in evaluating whether or not the proposed discharge is in the public interest.

(b) *Coordination with EPA.* Prior to actual issuance of permits for the discharge of dredged or fill material in waters of the United States, Corps of Engineers officials will advise appropriate Regional Administrators, EPA, of the intent to issue permits to which EPA has objected, recommended conditions, or for which significant changes are proposed. If the Regional Administrator advises, within fifteen days of the advice of the intent to issue, that he objects to the issuance of the permits, the case will be forwarded to the Chief of Engineers in accordance with 33 CFR 325.11 for further coordination with the Administrator, EPA, and decision. The report forwarding the case will contain an analysis of the economic impact on navigation and anchorage that would occur by failing to authorize the use of a proposed disposal site, and whether there are other economically feasible methods or sites available other than those to which the Regional Administrator objects.

10. 33 C.F.R. § 325.8 provides in pertinent part as follows:

(b) *District Engineer's Authority.* .... District Engineers may issue permits over an unresolved objection of another Federal agency if that agency indicates to the District Engineer that it does not desire to refer the

Corps's April 22, 1977 notice, Fisheries Service, Wildlife Service, and EPA submitted to the Corps district engineer their objections to the issuance of the permit. Fisheries Service opposed the permit on the ground that the landfill would have a negative effect on the marine habitat. Wildlife Service opposed the permit on the ground that the marine habitat in the landfill area would become very active in the near future as a result of pollution control laws and that construction of Westway would therefore permanently preempt a potentially productive piscine population. EPA took the position that there were insufficient data available concerning the impact of the project on marine life and that, under applicable law, the permit therefore could not be issued.

The district engineer did not respond to the three agencies' objections, but instead forwarded them to the Project. The Project's response, which took the form of a several-hundred-page document, dated May 16, 1978, was submitted to the district engineer after review by FHWA; it (1) concluded that the predictions of a negative impact on the marine habitat were not well taken, because the Water Report demonstrated that the interpier area "functions neither as a nursery and migration area nor as a source of primary productivity to any extent"; (2) essentially repeated the conclusion of the FEIS that, even with the proposed landfill, the interpier area would be increasingly hospitable to numerous estuarine species; and (3) took the position that EPA's stance was "fundamentally biased and prejudged," and that its statement contained "sufficient inaccuracies, misinterpretations and misrepresentations" to render EPA's opinion "meaningless."

Fisheries Service, Wildlife Service, and EPA found these responses unsatisfactory. Wildlife Service and EPA stated that the Project had provided no new information to change their views, and Fisheries Service suggested that the Project "may not fully appreciate estuarine processes." The agencies conveyed these views to the district engineer during the summer of 1978. The district engineer also received letters of objection to the permit from New York City officials, private individuals, and various organizations. The district engineer forwarded these letters to FHWA, which took the position that the January 1977 EIS was completely adequate.

In December 1978, however, EPA persuaded NYSDOT to make a further biological study of the interpier region. The Project commissioned the engineering firm of Lawler, Matulsky & Skelly ("Lawler") for that purpose. The planned scope of the Lawler study was developed in consultation with Fisheries Service, Wildlife Service, and EPA. The Corps took no part in these discussions. In May 1979, shortly after the Lawler study had begun and six months before its scheduled completion, the Corps district engineer preliminarily approved the landfill permit. A formal document embodying the approval was issued in September 1979 on the basis of reports prepared in part by Linda Monte, a Corps biologist then at the district level, who later moved to the division level where she was also assigned to the Westway matter. Monte's report discussed the effects of the proposal on aquatic environments and concluded that the Lawler data would not be necessary for

application to a higher level of authority for review.

(c) *Division Engineer's Authority.* .... The Division Engineer shall not proceed with the issuance of a permit if, within 15 days after the date of this notice of intent to issue a permit an authorized representative of [another] Federal agency indicates to the Division Engineer in writing that he wishes to bring his concerns to the departmental level and has departmental concurrence to do so. In such cases, the proposed permit will be forwarded to higher authority for resolution.

(d) *Referral to the Chief of Engineers.* Division Engineers will refer to the Chief of Engineers the following cases:

(1) When it is proposed to issue a permit and there are unresolved objections from another Federal agency which must be handled under special procedures specified in statutes or Memoranda of Understanding which thereby preclude final resolution by the Division Engineer ....

a decision on the Westway permit and that no supplemental EIS ("SEIS") was required.

Because of the continuing objections of the Fisheries Service, Wildlife Service, and EPA to issuance of the permit, however, the district engineer's decision was submitted for review by the division engineer. The review in the division engineer's office resulted in a conclusion that the FEIS contained little useful information on the fisheries question, and the division engineer decided to await the results of the Lawler study before making his decision on the permit.

By the end of 1979, the Lawler sampling had revealed significant numbers of fish in the interpier area, and the study was extended to cover the thirteen-month period from April 1979 through April 1980. Lawler regularly forwarded its sampling data to the Project. The Project, however, relayed only limited information about the results to FHWA and to Monte. The Corps division engineer requested the Lawler data in late 1979 and early 1980. The Project refused to provide them, however, on the ground that the Corps might be forced to reveal the data under the Freedom of Information Act, 5 U.S.C. § 552(a) (1976 & Supp. V 1981). Finally, in June 1980, the Project furnished copies of an early Lawler "progress report" to the division engineer's office and EPA. This progress report included data only through November 1979, although several months' later data had been collected and showed, for the most part, that the months of greatest abundance of fish in the interpier area had been October 1979 through April 1980.

The Lawler progress report provoked the Corps in mid-August 1980 to request a meeting with the Project and FHWA to discuss "mitigation" measures to be taken, see 33 C.F.R. § 320.4(c),[11] i.e., measures to minimize the loss of fisheries habitat or to compensate for its loss. By that time, the Project had received a draft copy of the final Lawler report, which it had forwarded to NYSDOT and FHWA, but not to the Corps. The mitigation meeting was held on August 13, 1980, and it was agreed that the Project would develop mitigation concepts and that FHWA would consider funding the cost of mitigation.

In late August 1980, EPA informed the Corps that it felt the Lawler data it had been given showed the landfill would result in a loss of habitat for certain species of fish, including white flounder, white perch, and striped bass. Attorneys for Sierra Club, who had obtained interim Lawler data, contended to the Corps that the data required a SEIS. The Corps sought the view of the FHWA as to whether a SEIS was required; FHWA in turn referred the matter to the Project and continued to express interest in the subject of mitigation.

At a mitigation meeting on September 8, 1980, the first complete volume of the Lawler study was finally furnished to the Corps and to Fisheries Service, Wildlife Service, and EPA. The last three agencies persisted in their objections to the Corps's issuance of the Westway permit. Nevertheless, on November 26, 1980, the division engineer informed the agencies that he had concluded that the landfill would not be detrimental to aquatic life in the interpier area, and that he would recommend issuance of the permit. The division engineer acquiesced in FHWA's advice that no SEIS was necessary. He recommended to FHWA, however, that the Lawler report be filed with EPA as "supplemental information" to the FEIS and circulated to concerned agencies and interested public parties who had provided comments on the DEIS and the FEIS. Apparently this was never done.[12]

In late 1980 and early 1981, Fisheries Service, Wildlife Service, and EPA again requested review of the permitting decision,

---

11. See note 8 supra.

12. As discussed in Part III.C.3. infra, although the final Lawler report revealed a far greater number and variety of fish in the interpier area than suggested by the FEIS, the district court found that in fact the report did not disclose as great an abundance of fish as the underlying Lawler data revealed. 536 F.Supp. at 1247–48.

this time by the Corps chief of engineers, on the grounds of adverse, insufficiently mitigated impact on fishery resources.[13] Fisheries Service expressed concern that the information on which the permitting process had relied was biased. On February 18, 1981, however, the Corps chief of engineers approved the landfill permit, and the objecting agencies decided not to appeal the decision to the Assistant Secretary of the Army. Fisheries Service stated that it lacked a "firm conviction" that the project would result in "severe, irreversible environmental degradation."

## D. *Proceedings in the District Court*

In March 1981, plaintiffs commenced the present suit [14] against the Corps and NYS-DOT, attacking issuance of the landfill permit on several grounds. Their principal claim was that the January 1977 EIS was inadequate because of the insufficiency of its treatments of fisheries, the relationship of Westway to the development of the West Side of Manhattan, traffic and air quality impact, problems associated with toxic chemicals and flooding, alternatives to Westway, and the possibility of a funding shortfall. Plaintiffs contended that, by relying on the inadequate FEIS, the Corps had violated NEPA, the Clean Water Act, and § 10 of the Rivers and Harbors Act. The other grounds of plaintiffs' challenge included the contention that the landfill permit should be voided because the landfill would be a "dike" within the meaning of § 9 of the Rivers and Harbors Act and hence would require the express authorization of Congress.

The district court granted summary judgment dismissing all of the claims except those concerning the FEIS's treatment of the fisheries issue, and held a bench trial as to the latter ("First Trial"). Following the trial, in a thorough opinion dated March 31, 1982, reported at 536 F.Supp. 1225, Judge Griesa found, *inter alia,* that striped bass is one of America's most highly esteemed game and food fishes, attracting millions of fishermen, both sport and commercial, each year and commanding increasingly high prices in the market; and that the Hudson River is the second most important contributor of striped bass to the Atlantic Coast fishery, providing 18–32% of all the striped bass in the New York Bight and Long Island Sound. As contrasted with the FEIS's characterization of the Hudson interpier area as a biological wasteland, the court found that that area in winter houses a concentration of juvenile striped bass. The court found that the Corp's treatment of the fisheries issue failed to meet the requirements of NEPA. His opinion stated in part as follows:

> The most significant environmental impact requiring consideration by the Corps of Engineers was the impact of the proposed landfill on fishery resources. The Corps was under a duty to make reasonable effort to ascertain the facts, and then

**13.** In December 1980, a full-scale "Reevaluation" of the FEIS had been commenced in accordance with FHWA regulations. As with previous Westway documents, the fisheries section of the Reevaluation was drafted by the Project, and the Reevaluation, issued in August 1981, concluded that the Lawler study had provided no reason to alter the conclusion of the FEIS that the landfill would have little effect on the productivity of the Hudson River.

**14.** Westway was also the subject of two earlier actions. In 1978, Sierra Club had commenced a suit challenging the Corps district engineer's rejection of its request for a supplemental EIS; that suit was dismissed as premature. *Sierra Club v. United States Army Corps of Engineers,* 481 F.Supp. 397 (S.D.N.Y.1979). In 1974, a consumer group had commenced an action seeking to bar Westway on the ground that the available federal funds should be used for mass transit rather than a highway. *Action for Rational Transit v. West Side Highway Project,* 517 F.Supp. 1342 (S.D.N.Y.1981) ("ART" litigation). The action lay dormant until the present suit was instituted. Thereafter the ART plaintiffs moved for a preliminary injunction against the State's acquisition of Westway rights-of-way from the City. Their motion was denied in July 1981, and their complaint was dismissed in the court's March 31, 1982 decision in the present case, except to the extent that an injunction might be issued in connection with the fisheries issues. 536 F.Supp. at 1232–33. That decision was affirmed by this Court. *See Action for Rational Transit v. West Side Highway Project,* 699 F.2d 614 (2d Cir.1983).

to set forth those facts in an environmental impact statement. Under the mandate of NEPA, the Corps was required to make a full disclosure of the information about fishery resources, and to give an opportunity for comment by interested parties. As part of this process, the Corps was required to make public the views of the federal agencies with jurisdiction and expertise on the subject of fisheries.

The total failure of the Corps to comply with these obligations has been demonstrated beyond any question. At no point did the Corps make any effort of its own to ascertain the facts about marine life in the interpier area. It was content to rely upon the January 1977 EIS, despite warnings from EPA, [Fisheries Service] and [Wildlife Service] that the information in this statement about aquatic impacts was probably unreliable. After the [Lawler] report was obtained, at the instance of the other agencies, the invalidity of the conclusions in the January 1977 EIS regarding aquatic impact was proved. The interpier area was shown to be a highly significant and productive habitat for fish, including striped bass. The proposed landfill would have the impact of destroying this habitat. The Corps was obligated under NEPA to publicly disclose this information and this impact in an environmental impact statement. It did not do so. Instead, it acquiesced in the urgings of [NYSDOT] and the FHWA to withhold the information.

. . . .

Aside from public disclosure, the Corps had the obligation to develop a full and adequate environmental impact statement in order to ensure that its own deliberations took into account the relevant facts and the environmental impacts. The record in this case demonstrates the salutary [sic] nature of this legal requirement, and the total non-compliance by the Corps. The District Engineer's recommendation was made without having any reliable fishery information whatever. The Division Engineer acted following receipt of the [Lawler] report, but obtained no appropriate technical assistance from the Corps' own biologists or from the other federal agencies with expertise. The Chief of Engineers quickly affirmed what was done at the lower levels. This wholly inadequate procedure would have been avoided if the District Engineer had promptly instituted steps to prepare and promulgate an environmental impact statement as required by NEPA.

Because of the failure of the Corps to comply with NEPA, its issuance of the Westway landfill permit was invalid and must be set aside.

*Id.* at 1252–54. The court found that the Corps's failures also violated the Clean Water Act and § 10 of the Rivers and Harbors Act. *Id.* at 1254.

On April 14, 1982, the court entered a judgment in favor of the plaintiffs which granted the following principal relief: (1) voided the Westway landfill permit granted by the Corps; (2) ordered that, in the event NYSDOT applied for a new permit, the Corps was to undertake proceedings in accordance with NEPA, the Clean Water Act, and § 10 of the Rivers and Harbors Act, including (a) preparation of an adequate supplemental EIS with respect to the fisheries issues, (b) inclusion in the SEIS of current information on subjects other than fishery resources, (c) an independent evaluation of all fisheries data collected during the Lawler study, (d) after consultation with Fisheries Service, Wildlife Service, and EPA, the undertaking or contracting for such additional fisheries studies as the Corps concludes are necessary for its independent evaluation; and (3) enjoined any further Westway activities affecting the bed or waters of the Hudson River pending the Corps's reconsideration. The court ordered the Corps to keep records of all activities in relation to any new application and its consideration thereof. (Judgment dated April 14, 1982 ("April Judgment").) The court interpreted the April Judgment as requiring that the SEIS be prepared by the Corps itself, and not jointly by the Corps and FHWA.

On April 13, 1982, at the suggestion of the district court, plaintiffs had moved to amend their complaint to add the United States Department of Transportation and FHWA, and officials of those agencies, as defendants to the present action. Plaintiffs contended (1) that the FHWA design, location, and funding approvals of Westway were invalid because the January 1977 EIS was misleading and incomplete, in violation of NEPA, and (2) that in any event, developments following the issuance of the FEIS, including the Lawler study, the adverse comments of Fisheries Service, Wildlife Service, and EPA, new proposals for alternatives to Westway, urban renewal on the West Side, increases in the cost of Westway, and increases in the estimated levels of traffic and air pollution resulting from the construction and operation of Westway, mandated preparation of a supplemental EIS on all of these issues. On April 20, 1982, the district court granted the motion to add the new federal defendants, stating that it would be anomalous to enjoin the Corps from proceeding on the basis of the FEIS without also enjoining the agency that had signed the FEIS and was to fund the project.[15]

Following a trial with respect to the new federal defendants ("Second Trial"), the district court issued an opinion on June 30, 1982, reported at 541 F.Supp. 1367, ruling in favor of plaintiffs only on their claim that the FEIS was inadequate with respect to fisheries impacts. The court held that on this issue FHWA had failed to comply with NEPA, finding

> that the information in the January 1977 EIS regarding fisheries was untrue. The authors of the EIS knew, or should have known, that they had no basis for the presentation made on this subject. Subsequently, when the data from the fishery study became available, this [sic]

data demonstrated positively the falsity of the EIS on the subject of fisheries. The FHWA was under a duty to file a supplemental environmental impact statement setting forth the facts. The FHWA wilfully refused to take the necessary corrective action.

> The evidence at the second hearing not only demonstrated the failure of the FHWA to fulfill its own obligations under NEPA, but also reinforced the evidence presented at the first hearing to the effect that the FHWA and [NYSDOT] colluded in a successful effort to persuade the Corps of Engineers to refrain from issuing an environmental impact statement in connection with the landfill application.

*Id.* at 1370. In particular as to the FEIS's fisheries information the court found that

> FHWA and [NYSDOT] lacked a sufficient basis for making the assertions on the subject of fishery impact which are contained in the 1977 EIS. . . . [T]hey realized that the sampling which had been carried out in preparation for the January 1977 EIS was inadequate [and] that the reason the earlier study revealed virtually no fish in the interpier area was that the study was made at a time of year which was not representative and the sampling techniques were faulty. The court concludes that those responsible for preparing the fishery material in the January 1977 EIS knew, or should have known, of the lack of factual basis for what was stated.

> This does not mean that, as of 1977, there was any substantial body of information positively indicating that the interpier area was a fish habitat. The point is that the January 1977 EIS categorically asserted the opposite. There was no basis for such a presentation.

---

**15.** At the same time the court granted plaintiffs' motion for a preliminary injunction against FHWA's payment to NYSDOT with respect to the State's acquisition of the Westway right-of-way from New York City. This injunction became a permanent injunction following trial of plaintiffs' claims against the new defendants and was the subject of an appeal by the City (which had intervened in the action at the time of preliminary injunction), NYSDOT, and FHWA. That appeal was consolidated with the present appeals for argument and thereafter was severed for publication of our decision reversing the injunction. *See Sierra Club v. Hennessy,* 695 F.2d 643 (2d Cir.1982).

*Id.* at 1371–72. Finally, the court concluded that

[s]ince the January 1977 EIS did not make a true or adequate presentation on the subject of fisheries, the FHWA had the obligation to issue a correct supplemental EIS, something which it has never done.

Even if one could say that the January 1977 EIS was justified on the basis of the information then existing, nevertheless the [Lawler] fisheries data constituted information of such importance on the subject of environmental impact that the FHWA was under a duty to issue a supplemental EIS.

Such a duty of supplementation is implicit in NEPA. . . .

It can hardly be doubted that the [Lawler] fisheries data constituted significant information relevant to environmental concerns and bearing on the impact of the proposed Westway project.

The FHWA, in collaboration with [NYSDOT], acted in willful derogation of the requirements of law in failing to issue a corrective supplemental environmental impact statement. The FHWA fully recognized the serious nature of the environmental impact which had been revealed by the new fisheries data, but refrained from making the required public disclosure.

*Id.* at 1382–83.

On July 23, 1982, the court entered a judgment ("July Judgment") enjoining FHWA from granting any approvals for Westway prior to preparation, either by the Corps with FHWA's substantive approval or by FHWA itself, of a supplemental EIS as required by the April Judgment—*i.e.,* one dealing adequately with fisheries issues and containing an undated treatment of nonfisheries issues. The court also ordered FHWA, as it had ordered the Corps, to keep records of all activities in connection with the reconsideration of Westway. In addition, the court appointed a special master to oversee compliance with its judgments. As set forth in the margin,[16] the special master was given the authority to, *inter alia,* require FHWA and the Corps to submit detailed plans for their preparation of a supplemental EIS, and was given the power to review those plans and the agencies' actions, summon officials to testify under

---

**16.** The July Judgment provided in part as follows:

3. The Special Master will have the duty and authority to perform the following acts:

(a) Require submission of detailed plans from the FHWA and the Corps for their compliance with the Court's orders and the applicable law; consider such plans and the comments and objections of the parties thereon; and report findings and recommendations to the Court;

(b) Take such action as he deems appropriate to permit the parties to be informed regarding compliance by the FHWA and the Corps with the Court's orders, with the plans to implement those orders, and with the applicable law, including without limitation requiring the submission of compliance reports; consider relevant comments and objections of the parties; hear claims of noncompliance; and report findings and recommendations to the Court, such reports to be made no less frequently than every sixty days;

(c) Require submission of any proposed draft or final EIS prior to its submission to the Court; consider relevant comments and objections of the parties; hear claims of noncompliance with the Court's orders or the applicable law; and report findings and recommendations to the Court.

4. The Special Master, for purposes of discharging his duties under this order, shall have all powers granted in Fed.R.Civ.P. 53. He shall have the power to do all acts and take all measures necessary or proper for the efficient performance of his duties, including without limitation the power to:

(a) Conduct meetings with counsel and personnel of the FHWA, the Corps of Engineers and other parties subject to the orders of the Court, on such notice as may be appropriate;

(b) Require the FHWA, the Corps and other parties subject to the orders of the Court to produce documents for inspection and copying;

(c) Take and permit the taking of depositions and hold hearings at which testimony is taken and other evidence is received;

(d) Require the submission of reports on matters relevant to the purposes of this reference and require answers under oath to written interrogatories;

(e) Have proceedings transcribed by an official federal court reporter, as deemed necessary.

oath, compel the production of documents and the answering of interrogatories under oath, compel the submission of compliance reports, make initial findings of compliance or noncompliance with the court's orders, and report findings and make recommendations to the court.

### E. Issues and Prior Proceedings on the Present Appeal

The parties present for our review several issues going to the merits of plaintiffs' claims and to various aspects of the relief ordered by the district court. NYSDOT challenges principally the court's decision on the merits, contending (1) that the court erred in finding that (a) the FEIS's treatment of the fisheries issue was inadequate when the FEIS was issued, and (b) the subsequent Lawler data required the agencies to prepare a supplemental EIS, and (2) that the court erred in concluding, on the basis of these findings, that there had been violations of NEPA, the Clean Water Act, and the Rivers and Harbors Act.

NYSDOT and the federal defendants contend that even if the court was correct in its conclusions that the federal statutes had been violated as to the fisheries question and that a supplemental EIS was required on that issue,[17] the court erred in ordering that the SEIS include updated consideration of issues other than fisheries. In addition, the federal defendants contend that the court had no power to impose record-keeping requirements on the Corps and FHWA, to prohibit the Corps and FHWA from being joint lead agencies in the preparation of the SEIS, or to appoint a special master to control the federal agencies' reconsideration.

On its cross-appeal, Sierra Club contends principally that the district court erred in upholding the Corps's 1981 reliance on the information in the 1977 FEIS with respect to nonfisheries issues, because (1) the Corps was required to base its permitting decision on an up-to-date EIS, and (2) the Corps was not entitled in any event to rely on the January 1977 EIS because it was prepared by NYSDOT, the permit applicant, rather than by a federal agency. In addition, plaintiffs renew their contention that the Westway landfill constitutes a "dike" requiring Congressional authorization under § 9 of the Rivers and Harbors Act.

Following oral argument of the appeals, this panel, with Judge Oakes dissenting, granted the federal defendants' motion for a stay of the district court's judgments insofar as they appointed a special master and had the effect of determining that the Corps and FHWA could not act as joint lead agencies in preparation of a supplemental EIS. We declined, with Judge Meskill dissenting, to stay the court's imposition of record-keeping requirements in connection with the agencies' reconsiderations.

We turn now to the merits of the various appeals. For the reasons below, we uphold the district court's determinations (1) that FHWA and the Corps breached their duties under NEPA, (2) that the Corps violated the Clean Water Act by unquestioningly relying on a FEIS that was inadequate as to the issue of aquatic impact, and (3) that those violations warranted the invalidation of the landfill permit granted by the Corps and of the FEIS with respect to fisheries issues. We conclude, however, that neither the reasons given by the district court nor those raised by plaintiffs in their cross-appeal justified the district court's order that a supplemental EIS include material on issues other than fishery resources, and we therefore modify the judgments in this respect. Finally, we vacate the court's appointment of a special master to oversee the preparation of a supplemental EIS and the ruling that FHWA and the Corps may not act as joint lead agencies in its preparation, but we uphold the requirement that those agencies maintain adequate records to permit appropriate judicial review of their decisions reached after reconsideration.

17. The federal defendants have taken the position that they disagree with the district court's findings concerning their noncompliance with the statutes but that, given their view that the public interest would best be served by a prompt reconsideration of Westway, they would limit their appellate challenges to certain aspects of the relief ordered.

## II. THE MERITS

### A. NEPA

■ As the Supreme Court has stated repeatedly, although NEPA established " 'significant substantive goals for the Nation,' " the balancing of the substantive environmental issues is consigned to the judgment of the executive agencies involved, and the judicially reviewable duties that are imposed on the agencies are " 'essentially procedural.' " *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) ("*Vermont Yankee*")). "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (quoting *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 838 (D.C. Cir.1972)).

■ The primary function of an environmental impact statement under NEPA is " 'to insure a fully informed and well-considered decision,' [although] not necessarily 'a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.' " *Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra*, 444 U.S. at 227, 100 S.Ct. at 499 (quoting *Vermont Yankee, supra*, 435 U.S. at 558, 98 S.Ct. at 1219); *see also Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 697 (2d Cir.1972). In order to fulfill its role, the EIS must set forth suffi-

cient information for the general public to make an informed evaluation, *see id.; Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir.1973), and for the decisionmaker to "consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action." *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir.1977) ("*County of Suffolk*"), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). In so doing, the EIS insures the integrity of the process of decision by giving assurance that stubborn problems or serious criticisms have not been "swept under the rug." *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir.1973). The " 'detailed statement' " required by § 102(2)(C) of NEPA thus "is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions." *Andrus v. Sierra Club*, 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979).

■ Given the role of the EIS and the narrow scope of permissible judicial review, the court may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information,[18] has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public. *County of Suffolk, supra*, 562 F.2d at 1383. We have described the district court's function as follows:

> The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS. *Environmental Defense Fund v. Froehlke*, 368 F.Supp. 231, 240 (W.D.

---

18. In evaluating a claim that an EIS fails to contain sufficient information to satisfy NEPA, the court should apply a

"rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-

maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*County of Suffolk, supra*, 562 F.2d at 1375.

Mo.1973), *aff'd,* 497 F.2d 1340 (8th Cir. 1974). The court's task is merely "to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Morton,* 510 F.2d [813, 819 (5th Cir. 1975)]. "The court is not empowered to substitute its judgment for that of the agency." *Scenic Hudson Preservation Conference v. FPC,* 453 F.2d 463, 468 (2d Cir.1971) *cert. denied,* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972), *quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a "substantial basis in fact," *FPC v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972), and if the EIS has set forth responsible opposing scientific views, *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 463 F.2d 783 (1971), it is not for the district court to resolve conflicting scientific options.

*Id.*

■ If the district judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, he may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision. Further, the court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise. *Silva v. Lynn, supra,* 482 F.2d at 1285:

> [W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response.

*See also County of Suffolk, supra,* 562 F.2d at 1383: "Where evidence presented to the preparing agency is ignored or otherwise inadequately dealt with, serious questions may arise about the author's efforts to compile a complete statement."

■ In the present case the district court's rulings on the merits of plaintiffs' NEPA claims were consonant with the proper scope of its review and the proper view of the obligations imposed on FHWA and the Corps. With respect to the fisheries issues, the court found, *inter alia,* that the FEIS contained false statements depicting the interpier region as "biologically impoverished" and as a "biological wasteland," when in fact the interpier area in winter harbored a concentration of juvenile striped bass. The court found that the FEIS statements regarding aquatic impact had not been compiled in "objective good faith." Notwithstanding NYSDOT's contention that "the FEIS set forth the relevant facts that were known about the interpier area and the surrounding Hudson estuary at the time it was prepared . . . ," (NYSDOT brief on appeal at 24), the court's findings to the contrary are amply supported by the record.

For example, after the DEIS was issued, the Project received critical comments regarding fisheries impact from Fisheries Service, Wildlife Service, and EPA to the effect that the fish life had been underestimated and that the information provided was inadequate. Although the FEIS purported to respond to these comments, no new studies were performed, no additional information was collected, no further inquiry was made; and the FEIS essentially reiterated or adopted the statements in the DEIS. Employees of the Project and FHWA testified that they knew before getting any data from the Lawler study that the Project's 1973 sampling had been faulty in both timing and technique and that these flaws were the reason the earlier study had revealed virtually no fish in the interpier area. Yet the Water Report, prepared in

the wake of comments to the DEIS and appended to the FEIS, simply relied on the 1973 data. Bridwell, who was responsible for the preparation of the FEIS's fisheries discussion testified that he was aware that the Water Report had not attempted to make any thorough or investigative inquiry into the existence of fish in the interpier area. He stated that the Water Report had attempted to verify only the existing literature on fish life in that area. It is not clear that even this academic study was performed: the Water Report neither identified any existing literature on the subject nor stated that there was no such literature; Bridwell himself was unaware of whether any literature existed. The evidence at trial suggested that there was no literature upon which the Report could have based its conclusion that the interpier area was biologically impoverished.

Initial responsibility for the inaccurate characterization of the interpier area as a biological wasteland must be attributed to Sydec which the court found authored the FEIS and which was under the jurisdiction of NYSDOT. 541 F.Supp. at 1371. NEPA did not prohibit FHWA's reliance on NYS-DOT for preparation of the FEIS, see NEPA § 102(2)(D), 42 U.S.C. § 4332(2)(D) (added by Pub.L. No. 94–83, 89 Stat. 424 (1975)), but it did require FHWA to make its own independent evaluation of the FEIS, § 102(2)(D)(iii), 42 U.S.C. § 4332(2)(D)(iii). There was no evidence that FHWA made any independent evaluation whatever of the fisheries issues. There was no proof that it had sought to learn what comments had been received on the DEIS from other federal agencies with expertise in special environmental subjects. FHWA officials testified that they could not recall whether they had reviewed the pointed criticisms of Fisheries Services. They stated that they may simply have ignored these criticisms as unimportant in relation to other Westway concerns. While it would indeed have been within FHWA's discretion to make a substantive determination that an adverse impact on fisheries did not outweigh the benefits to be gained, this was not the evaluation that was made.

Rather, FHWA ignored criticisms pointing out that FHWA lacked "sufficient information to permit a valid assessment" of marine impact.

In short, we concur in the district court's view that the FEIS did not reasonably adequately compile relevant information with respect to fisheries impact. The evidence as to the cavalier manner in which the Project had reached its conclusion that the interpier area was a biological wasteland, and as to FHWA's failure to make an independent evaluation or to react in any way to sister agencies' pointed comments that the draft EIS did not provide adequate information for a reasoned assessment of impact on fisheries, easily supports the district court's findings (1) that the FEIS's fisheries conclusions lacked a "substantial basis in fact," and (2) that a decisionmaker relying on the January 1977 EIS could not have fully considered and balanced the environmental factors. In the circumstances, we agree that FHWA's issuance of the FEIS, and the Corps's reliance on the FEIS, violated NEPA.

## B. *The Clean Water Act*

█ The district court's ruling that the Corps violated § 404 of the Clean Water Act, 33 U.S.C. § 1344, is also supported by the record. The obligations imposed on the Corps by the Clean Water Act differ somewhat from those imposed by NEPA. In particular, although the Clean Water Act requires public hearings and consideration of the "public interest" before the Corps decides whether to issue a permit, see 33 C.F.R. § 320.4, it does not itself require the same types of environmental disclosures that are required by NEPA. Rather, in order to satisfy the Clean Water Act, the Corps primarily must give public notice, conduct hearings, make its own assessment of the impacts of the proposed project, and create a reasoned administrative record for its decision. *See River Defense Committee v. Thierman*, 380 F.Supp. 91, 95 (S.D.N.Y. 1974).

In reviewing the validity of a decision by the Corps to issue a permit under the Clean Water Act, a court should, as provided by the Administrative Procedure Act ("APA"), uphold the decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976); *see Nofelco Realty Corp. v. United States,* 521 F.Supp. 458, 462 (S.D.N.Y.1974); *cf. Taylor v. District Engineer,* 567 F.2d 1332, 1336 (5th Cir.1978). Where the Corps may rely on an EIS previously issued by a sister agency, *see* 40 C.F.R. § 1500.7; 40 C.F.R. § 1506.3 (1982), the determination of whether a Corps permitting decision was arbitrary and capricious depends not only on the information disclosed by that EIS, but also on information disclosed by later studies and information conveyed to the Corps. *See Nofelco Realty Corp. v. United States, supra; see also Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Joseph G. Moretti, Inc. v. Hoffman,* 526 F.2d 1311 (5th Cir.1976).

The district court's findings suggest that the Corps's decision was arbitrary 'and capricious. The court found every level of the Corp's review process woefully inadequate. It found that although the district engineer did not make his decision to approve the permit application until some 2½ years after the application was filed, the decision "was made without having any reliable fishery information whatever." 536 F.Supp. at 1253. Similarly, the court found that the division engineer's decision was based on so little information that it could "only be explained as resulting from an almost fixed predetermination to grant the Westway landfill permit." *Id.* at 1248. It found the chief of engineer's decision virtually a rubber stamp of the decisions of his subordinates: "It is clear that [the chief of engineers] sought to expedite the matter, and saw no reason to 'second guess' the decision of the Division Engineer." *Id.* at 1251.

These findings are supported by the record. NYSDOT's application for a permit was filed in April 1977 and formally approved by the district engineer in September 1979. There was no evidence that in the interval the Corps did anything whatever to conduct its own investigation into the fisheries questions on which it was to pass. It had announced that the FEIS was adequate for its purposes barely two weeks after receiving NYSDOT's application, hardly an indication that any critical thought had been brought to bear on the fisheries issues. The Corps then received criticisms from Fisheries Service, Wildlife Service, and EPA, indicating that there were serious inadequacies in the information provided by the SEIS. It was required to give "great weight" to the views of Fisheries Service and Wildlife Service, 33 C.F.R. § 320.4(c); yet it merely passed them on to the Project and was not moved to conduct any inquiry of its own. Nor, apparently, was it interested in helping to shape the Lawler study that EPA finally prevailed upon NYSDOT to commission. Indeed, knowing that the Lawler study was underway, the district engineer decided to approve the permit without waiting for the results of the study. The division engineer's decision was at least equally flawed. By the time that decision was rendered, the Lawler report had been received, and it confirmed the criticisms of the objecting federal agencies and revealed the inaccuracy of the FEIS's conclusion that the interpier area was a biological wasteland. Nonetheless, the division engineer, like the district engineer, merely forwarded all federal agency criticisms of the FEIS to NYSDOT and FHWA, and had no independent Corps study made of the questions raised. At the chief of engineers level there may have been some effort by a Corps biologist to review independently the Lawler data, but this hardly sufficed to meet the Corp's obligation under the Clean Water Act to make a reasoned decision: it resulted only in a two-page memorandum that the record does not reveal was even reviewed by the decisionmakers.

Thus the record discloses that at every level of review the Corps simply ignored the views of sister agencies that were, by law, to be accorded "great weight." The evi-

dence amply warranted the district court's finding that the Corps never made a serious attempt to discover, or to make a decision based on, reliable fisheries information. In the face of the Lawler report and the other federal agencies' criticisms, the Corps's unquestioning reliance on the FEIS must be regarded as arbitrary and capricious. We affirm the court's ruling that the Corps violated the Clean Water Act.

## C. The Rivers and Harbors Act

### 1. Section 10

 Section 10 of the Rivers and Harbors Act, see note 5 supra, prohibits the creation of any obstruction in navigable waters without affirmative authorization by Congress and makes such an obstruction unlawful without the prior approval of the Corps chief of engineers and authorization by the Secretary of the Army. The district court ruled that the Corps's failures, inter alia, to investigate, develop adequate information, and make accurate public disclosures as to the fisheries issues constituted a violation of this provision. Whatever the validity of this conclusion, however, we reverse the judgment insofar as it upheld the

§ 10 claim since the Supreme Court has ruled that § 10 of the Rivers and Harbors Act does not provide a private right of action. *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).

### 2. Section 9

 Section 9 of the Rivers and Harbors Act [19] prohibits, inter alia, construction of dikes in navigable waters absent the prior approval of the Corps chief of engineers and the Secretary of the Army and the consent of Congress. Plaintiffs contended that defendants violated, or perhaps were about to violate, § 9 because Congressional consent had not been obtained for the proposed Hudson River landfill. The district court dismissed this claim as a matter of law prior to trial, without specifying its reasons. Whether or not the Westway landfill would be a dike within the meaning of § 9 as plaintiffs contend, we affirm the dismissal because we conclude that § 9 does not provide a private right of action.

Using the *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), analysis as employed by the Supreme Court with respect to § 10 in *California v. Sierra Club, supra,*[20] we see no grounds for con-

**19.** Section 9 of the Rivers and Harbors Act, 33 U.S.C. § 401 (1976), provides as follows:

§ 401. Construction of bridges, causeways, dams or dikes generally

It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the

structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.

**20.** In *Cort v. Ash,* the Supreme Court identified four factors relevant in determining whether a private action may be maintained to enforce a statute that does not expressly provide for private enforcement.

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e.g., *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, e.g., *Amtrak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44

cluding that § 9 was designed to create a private right of action. There is no basis for inferring that § 9 was enacted for the "especial benefit" of any class of individuals, nor that plaintiffs would be within such a class if there were one. As is the case with § 10, § 9 "states no more than a general proscription of certain activities; it does not unmistakably focus on any particular class of beneficiaries whose welfare Congress intended to further." *Id.,* 451 U.S. at 294, 101 S.Ct. at 1779. In the absence of any apparent intent on the part of Congress to create a private right of action to enforce § 9, we affirm the district court's dismissal of plaintiff's § 9 claim.

### III. RELIEF

#### A. *The Requirement of a Supplemental EIS on Fisheries Issues*

■ The principal relief ordered by the district court was an injunction against any further Westway activities affecting the bed or waters of the Hudson River unless and until a supplemental EIS has been prepared by the Corps containing adequate and accurate information with respect to the fisheries issues. Subject to the modification set forth in Part III.C.2. *infra,* as to who may author the SEIS, we regard this relief as well within the proper scope of the district court's discretion in the circumstances of the present case.

L.Ed.2d 263 (1975); *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler,* 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); cf. *J.I. Case Co. v. Borak,* 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394–395, 91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619 (1971); *id.,* at 400, 91 S.Ct. at 2006 (Harlan, J., concurring in judgment).

422 U.S. at 78, 95 S.Ct. at 2088. *California v. Sierra Club, supra,* further refined the analysis, observing that when consideration of the first two *Cort v. Ash* factors fails to reveal any congressional intent to create a private right of

As discussed in Part II.A. *supra,* the record revealed that the authors of the FEIS had not made an adequate compilation of fisheries data, had not compiled information in objective good faith, had paid no heed to the experts' warnings that they lacked needed information, and hence had reached the erroneous conclusion that the interpier area was a biological wasteland. This baseless and erroneous factual conclusion then became a false premise in the decisionmakers' evaluations of the overall environmental impact of Westway and their balancing of the expected benefits of the proposed action against the risks of harm to the environment. Thus, the January 1977 EIS provided no valid "outward sign that environmental values and consequences [had] been considered" with respect to fisheries issues, *Andrus v. Sierra Club, supra,* 442 U.S. at 350, 99 S.Ct. at 2337, and hence furnished no assurance that the Westway approvals had been given on a reasoned basis.

Enforcement of NEPA requires that the responsible agencies be compelled to prepare a new EIS on those issues, based on adequately compiled information, analyzed in a reasonable fashion.[21] Only if such a document is forthcoming can the public be appropriately informed and have any confidence that the decisionmakers have in fact considered the relevant factors and not merely swept difficult problems under the rug. Accordingly, we uphold the district

action, the final two factors need not be reached. 451 U.S. at 298, 101 S.Ct. at 1781.

21. The necessity of filing a SEIS in this situation was, in fact, at one point, explicitly recognized in the Corps regulations. Those regulations provided as follows:

If the final environmental statement previously filed clearly failed to comply with the requirements of NEPA: e.g. ... failed to disclose the environmental impacts of the proposed action ... a revised environmental statement ... must be prepared and filed with CEQ.

33 C.F.R. § 209.410(g)(1) (1977). The withdrawal of this regulation does not affect the court's power to order such a SEIS to ensure that NEPA's goal of a reasoned decision is effectuated.

court's requirement that before Westway landfill may proceed, FHWA or the Corps must prepare a new EIS on fisheries issues. Whether the new statement be called an amended EIS as in *Silva v. Lynn, supra,* or a supplemental EIS, as in the judgments below, NEPA requires no less.

Our ruling on this point is not, however, an expansive one. We do not intend to suggest that inaccuracies in an EIS will always, or even usually, warrant a court's ordering the preparation of a supplemental EIS. Had the January 1977 EIS contained a reasoned analysis of fisheries data reasonably adequately compiled, and merely drawn an erroneous factual conclusion, we would not believe it proper to order FHWA or the Corps to prepare a SEIS. *See Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). Or had reasonable investigative efforts resulted in less accurate data than later became available, the determination as to whether the later data warranted preparation of a SEIS, *see* 33 C.F.R. § 230.11(b) (1981); *see also* 33 C.F.R. § 209.410(g)(1) (1977); *see also* Part III.B. *infra,* would be a matter committed to the discretion of the responsible agencies, not to the judgment of the court. *See Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir.1980) (it is for the agency to "evaluate [new information] and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures").

Nor do we express any view as to whether the decisionmakers' overall evaluation of the benefits and detriments of Westway was "wrong." We hold simply that a decision made in reliance on false information, developed without an effort in objective good faith to obtain accurate information, cannot be accepted as a "reasoned" decision.

### B. *The Requirement of a Supplemental EIS on Nonfisheries Issues*

As indicated in Part I.D. above, the district court rejected plaintiffs' contentions that the January 1977 EIS was inadequate in its treatments of nonfisheries issues such as air and noise pollution, flooding, funding, and the like, and hence declined to find that FHWA and the Corps had violated NEPA and the Clean Water Act with respect to these issues. 536 F.Supp. at 1234. Nonetheless, in its April and July Judgments, the court ordered that before the Westway landfills could proceed, the Corps must prepare a SEIS containing current information on subjects other than fisheries impacts. Information was required as to such matters as current cost estimates, substantial new developments as to alternatives, and current plans for the selection of real estate and commercial developers. We conclude that this requirement was not justified either on the ground relied on by the district court, to wit, that the FEIS was probably out-of-date, or on the alternative ground urged by plaintiffs, *i.e.,* that the FEIS was prepared by an author on whom the Corps was not entitled to rely.

### 1. *The Passage of Time*

In an opinion dated August 5, 1982 ("August 5 Opinion"), denying the motion of FHWA and the Corps for elimination of the requirement that the SEIS include current nonfisheries information, the court gave the following reasons for requiring such information:

> The provision in the April 14 Judgment regarding non-fisheries information is based upon the obvious fact that certain important information contained in the EIS filed five years ago in 1977 is probably seriously out-of-date—such as information about cost estimates, the availability and value of certain alternatives, and other similar factors. The Judgment requires that the supplemental EIS provide current information on such subjects. This requirement is not something gratuitous on the part of the Court. It follows, as an inevitable necessity, from the fact that the Corps of Engineers is required to reconsider the *whole range* of relevant factors bearing upon the landfill permit application, that this range of fac-

tors must include current information on items such as costs and alternatives, and that the currently issued supplemental EIS must reflect the significant factors which are being considered by the Corps. All of this follows from the rulings of the Court, and must be included in the injunctive relief.

August 5 Opinion at 6 (emphasis in original). We disagree. Since the requirement that the SEIS include nonfisheries information was not justified by the violations found by the court, it was not a proper exercise of the court's discretion within the framework of NEPA or the regulations thereunder.

We note at the outset that supplemental nonfisheries information was not required as a remedy for any violation of NEPA. As to the nonfisheries questions, the court found no failure to compile adequate data, no failure to make a reasoned analysis of the data compiled, no disregard of any pertinent data, and no failure to disclose the relevant data to the public. In short, as to nonfisheries matters it found no failure by any party to proceed on a good faith basis, and hence no nonfisheries violation of NEPA or any other statute. As the bad faith and inadequacies found by the court concerned only the fisheries issues, the requirement of a SEIS covering nonfisheries issues was not responsive to the violations found and was not needed to vindicate any interest of NEPA in requiring an EIS.

Nor do we view the district court's feeling that the January 1977 EIS "is probably seriously out-of-date" as a valid basis for ordering that a nonfisheries SEIS be prepared. First, the mere passage of time rarely warrants an order to update the information to be considered by an agency:

"Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed]. . . . If upon the coming down of the order litigants might demand rehearing as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening."

*Vermont Yankee, supra,* 435 U.S. at 554–55, 98 S.Ct. at 1217 (quoting *ICC v. Jersey City,* 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944) (bracketed material in *Vermont Yankee* )).

Further, the obligation of the Corps under the Clean Water Act to make an up-to-date investigation in order to determine whether to issue a permit does not mean that the Corps must issue an updated SEIS since, as discussed in Part II.B. *supra,* the Clean Water Act does not require issuance of any EIS.

 Finally, with respect to NEPA, it is of course true that §§ 102(2)(A) and (B) impose on federal agencies the obligation to continue, even after an EIS is issued, to gather and evaluate new information relevant to the impact of their actions. 42 U.S.C. §§ 4332(2)(A) and (B). In general, however, the guidelines promulgated by the Council on Environmental Quality ("CEQ")[22] and by the Corps require that a SEIS be prepared only if the newly acquired information is "significant," *see* 40 C.F.R. § 1502.9(c)(1)(ii) (1981);[23] 33 C.F.R.

---

**22.** The CEQ was created by NEPA and is charged with responsibility to review, appraise, and make recommendations concerning federal programs and activities in light of NEPA. 42 U.S.C. § 4344(3). "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club, supra,* 442 U.S. at 358, 99 S.Ct. at 2341.

**23.** 40 C.F.R. § 1502.9(c)(1) provides as follows:
(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

§ 230.11(b);[24] *Warm Springs Dam Task Force v. Gribble, supra,* 621 F.2d at 1024, and we conclude that the ultimate determination as to whether a SEIS is required is left to the agency. *Cf. Hudson River Fishermen's Association v. FPC,* 498 F.2d 827 (2d Cir.1974) (requiring FPC hearings on effect of newly discovered fisheries information).

■ While we have had no prior occasion to interpret these guidelines with respect to where lies the responsibility for a determination that new information is so "significant" as to mandate a SEIS, we have analyzed the matter of who bears the responsibility for determining whether proposed action will so "significantly" affect the environment that an EIS is required in the first place. In *Hanly v. Kleindienst, supra,* for example, we ruled that the entity authorized to make the threshold determination as to whether an action is one "significantly affecting the quality of the human environment," within the meaning of § 102(2)(C) of NEPA, is the agency in charge of the proposed action. 471 F.2d at 828. *See also Hanly v. Mitchell,* 460 F.2d 640, 644 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). In *Hanly v. Kleindienst, supra,* we noted that "Congress apparently was willing to depend principally upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale [NEPA-disclosure] procedure." 471 F.2d at 830.

We see no basis for drawing a different inference as to Congress's intentions with respect to what entity should be authorized to determine whether a SEIS is required.

*See Warm Springs Dam Task Force v. Gribble, supra.* Thus, although the responsible agency may be ordered to conduct an analysis of newly received information and to evaluate it in light of the proposed action, *see Hanly v. Kleindienst, supra,* the ensuing decision as to whether the new material is sufficiently significant to warrant a SEIS must remain the responsibility of the agency.

■ In the present case, since the court did not find any bad faith in connection with the FEIS's treatment of nonfisheries issues we see no reason to deflect Congress's apparent intention. FHWA, in accordance with 40 C.F.R. § 1502.9(c)(1)(ii), and the Corps, in accordance with 33 C.F.R. § 230.11(b), should determine whether the passage of time since issuance of the FEIS and the intervening developments are sufficiently significant to mandate a SEIS, and the district court may order that this determination be made.[25] But the judgments may not properly compel the agencies to issue a SEIS as to nonfisheries issues on the ground that the FEIS is out-of-date.

### 2. An Unreliable Author

■ Plaintiffs have argued that a Corps SEIS as to nonfisheries issues is required because, since the January 1977 EIS was authored by NYSDOT, the permit applicant, rather than by a federal agency, the Corps was forbidden as a matter of law to rely on it. While plaintiffs' premise has merit, the conclusion they urge does not follow.

We agree with plaintiffs that under § 102(2)(D) of NEPA the Corps was not authorized to rely on an EIS prepared by NYSDOT. In a number of cases arising in

---

**24.** 33 C.F.R. § 230.11(b) (1981) provides as follows:

(b) *Supplements.* A Supplement to the draft of final EIS on file will be prepared whenever significant impacts resulting from changes in the proposed plan or new significant impact information, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action as discussed in 40 CFR 1502.9(c).

**25.** It may be that the court will conclude that such an order is, in whole or in part, unnecessary. In 1981 NYSDOT prepared, under FHWA supervision, an analysis of the January 1977 EIS which was a comprehensive reevaluation of all aspects of Westway in light of 1981 conditions and which concluded that a SEIS was not warranted. The reevaluation's discussion of nonfisheries issues was neither attacked by plaintiffs nor found wanting by the court. *See* 541 F.Supp. at 1381–82.

the early 1970's, this Court ruled that federal agencies had violated NEPA by relying on state agencies to prepare an EIS. We construed that reliance as an impermissible delegation of the federal agency's authority and responsibility to a local, interested entity that would not be likely to bring the needed objectivity to the mandated evaluation of federal interests:

> A state agency is established to pursue defined state goals. In attempting to secure federal approval of a project, "self-serving assumptions" may ineluctably color a state agency's presentation of the environmental data or influence its final recommendation. Transposing the federal duty to prepare the EIS to a state agency is thus unlikely to result in as dispassionate an appraisal of environmental considerations as the federal agency itself could produce.

*Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927, 931 (2d Cir.1974), *cert. granted, judgment vacated and remanded,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *reversed,* 531 F.2d 637 (in light of Pub.L. No. 94-83, 89 Stat. 424 (1975)); *accord Natural Resources Defense Council v. Callaway, supra,* 524 F.2d at 87 (evil sought to be avoided is preparation of EIS by "a state agency, with an individual 'axe to grind', i.e., an interest in seeing the project accepted and completed in a specific manner as proposed" because "[a]uthorship by such a biased party might prevent the fair and impartial evaluation of a project envisioned by NEPA"); *I-291 Why? Association v. Burns,* 517 F.2d 1077 (2d Cir.1975) (upholding preliminary injunction barring construction of federally funded highway where, although FHWA reviewed and maintained contact with state agency, state agency drafted EIS and FHWA approved the EIS four days after receipt of the state draft, without alteration or comment); *see also Greene County Planning Board v. Federal Power*

*Commission,* 455 F.2d 412, 420 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

An immediate result of these decisions was that the pace of FHWA funding for highways slowed appreciably.[26] In response, in 1975, Congress enacted § 102(2)(D) of NEPA, 42 U.S.C. § 4332(2)(D), Pub.L. No. 94-83, 89 Stat. 424, to provide that where the federal action involves a grant of funds to a state, the necessary EIS may be prepared under certain circumstances by the state with federal agency supervision: "any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official." The legislative history of § 102(2)(D) indicates that Congress intended this provision to allow reliance on state entities only by federal agencies whose chief responsibility was funding, and that it consciously refrained from allowing such reliance by agencies whose primary function was determining whether a permit should be issued. Permitting decisions were viewed differently because they generally involve a greater degree of federal decisionmaking. S.Rep. No. 52, 94th Cong., 1st Sess. 9, *reprinted in* 1975 U.S.Code Cong. & Ad.News 859, 866. Thus, the Committee reporting the bill out of conference "fully concur[red]" in the sentiment expressed during the legislative hearings on the bill that the amendment "reached only a very few Federal programs other than the Federal-aid highway program ... [for example] the Law Enforcement Assistance Administration program and the Bureau of Outdoor Recreation's program of grants under the Land and Water Conservation Fund Act." S.Rep. 52, *supra,* at 9; 1975 U.S.Code Cong. & Ad. News at 867.

In the present case, therefore, § 102(2)(D) sanctioned reliance on a state-prepared EIS by FHWA, a funding authori-

---

**26.** A Senate Report described FHWA's reaction to our decisions as "an almost total halt to all federally funded highway projects in the three states in the Second Circuit." S.Rep. No. 52, *supra,* at 2, 1975 U.S.Code Cong. & Ad.News 859, at 860.

ty,[27] but not by the Corps, a permitting agency.[28] And although the Corps would perhaps have been authorized by 40 C.F.R. § 1506.3(a) (1982)[29] to rely on an EIS prepared by a sister federal agency, this provision provides the Corps no solace with respect to the FEIS here, since the FEIS was prepared by NYSDOT. Thus, within the terms of NEPA as we have construed them, the Corps should have prepared its own EIS and not have relied on the FEIS prepared by NYSDOT, regardless of the FEIS's accuracy vel non.

■■■■ The fact that the Corps should have prepared its own EIS rather than relying on the FEIS prepared by NYSDOT does not, however, mean that an order should have been entered requiring the Corps to prepare a SEIS on nonfisheries issues as well as fisheries issues. First, as a purely logical matter, to be responsive to this violation, a remedial order would have had to require the Corps to prepare a completely new EIS, not merely a supplemental EIS with respect to developments since 1977. Such a remedy would have required a wasteful duplication of effort as to issues the court has found adequately treated. Not only common sense, but executive policy as well suggests that such duplication be avoided. *See* 40 C.F.R. § 1500.4 (1982) (CEQ regulations directing agencies to reduce paperwork in implementing NEPA); Clean Water Act § 404(q), 33 U.S.C. § 1344(q) (Corps and Department of Trans-

portation directed to cooperate to reduce unnecessary duplication and paperwork in processing Department projects requiring Corps approval). Nor would it have been proper to order the Corps to prepare a SEIS on nonfisheries issues simply because it violated NEPA by relying on an EIS that was, on those issues, adequate, for "[r]elief under NEPA should be remedial rather than punitive." *Warm Springs Dam Task Force v. Gribble, supra,* 621 F.2d at 1022. *See Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

In all the circumstances, we conclude that the refusal of the district court to order preparation of a nonfisheries SEIS on the ground advanced by plaintiffs was entirely appropriate.

## C. *The Special Procedural Relief*

In addition to granting the above substantive relief, the district court granted several forms of special relief concerning the procedures to be followed by FHWA and the Corps in their reconsideration of Westway questions. These included the imposition of a record-keeping requirement, an order prohibiting FHWA and the Corps from acting as joint lead agencies in the preparation of a SEIS, and the appointment of a special master to oversee compliance with the court's judgments. While we uphold the record-keeping requirement, we vacate the prohibition against the two agencies' acting as joint lead agencies and the appointment of the special master.

> When a non-Federal agency cooperates with the Corps of Engineers by construction or other participation, a final environmental statement will be prepared by the District Engineer and filed with CEQ prior to advertisement of the work. The non-Federal agency may furnish environmental data; however, the District Engineer will be responsible for independent verification and use of the data and for the environmental statement. 33 C.F.R. § 209.410(e)(8) (1977).

**29.** Subsequent to the Corps announcement that it was following a "lead agency" procedure, the CEQ· promulgated regulations allowing one agency to "adopt" a "*Federal* . . . environmental impact statement" of another, 40 C.F.R. § 1506.3(a) (promulgated November 1978) (emphasis added).

---

**27.** Even where such reliance is authorized, the section requires that the responsible federal official participate and provide guidance in the preparation of the EIS, § 102(2)(D)(ii), 42 U.S.C. § 4332(2)(D)(ii), and must independently evaluate the EIS, § 102(2)(D)(iii), 42 U.S.C. § 4332(2)(D)(iii). *See also* 40 C.F.R. § 1500.-7(c), which provided in 1974 as follows:

(c) Where an agency relies on an applicant to submit initial environmental information, the agency should assist the applicant by outlining the types of information required. In all cases, the agency should make its own evaluation of the environmental issues and take responsibility for the scope and content of draft and final environmental statements.

**28.** In 1977 the Corps's own regulations required it to take responsibility for the content of the EIS:

### 1. *Record-keeping*

██ In its April Judgment, the court included a provision requiring the Corps to "keep records of all activities, deliberations, and communications (including communications with the FHWA and any other federal official or agency) which occur in relation to [the Westway] permit application." The July Judgment imposed a like requirement on FHWA, NYSDOT, and the administrative units, consultants, and contractors of each. While such a requirement is out of the ordinary vein of relief appropriately ordered by a court in connection with a remand to a federal administrative agency, we conclude that in the circumstances of the present case it was permissible and did not constitute an abuse of the court's discretion.

In reaching this conclusion we start by recognizing the goals of judicial review under NEPA and the Clean Water Act. As discussed in Part II.A. above, judicial review of agency action for conformity with the requirements of NEPA is limited to evaluations of whether mandated public disclosure procedures have been followed and whether the decisionmakers have fully considered the environmental factors involved in order to reach a reasoned decision. As discussed in Part II.B., the court's review under the Clean Water Act focuses on whether the Corps has followed the mandated notice-and-hearing procedures and whether it has created a reasoned administrative record for its decision. And, as we have noted in Part III.B. above, the court may compel the decisionmaking agencies to compile the reasoned record needed to comply with these statutes before it accords the required judicial deference to any substantive decision reached by the agencies. *See Hanly v. Kleindienst, supra.* The imposition of a record-keeping requirement is thus closely related to both the statutory mandates that the agencies create reasoned records on which the decisionmakers will act and the responsibility of the court to determine whether this has been done.

While normally a court should not attempt to dictate the procedures to be used by the agency on remand, *see* authorities cited in Part III.C.3., *infra,* the circumstances of the trials conducted below justify the imposition of record-keeping requirements in the present case. At the First Trial, for example, in which the court sought to determine whether there was a rational basis for the actions of the Corps in ruling on NYSDOT's permit application, there was a surprising dearth of evidence as to the nature and substance of the Corps's investigations and deliberations. Although decisions had been made by the district engineer, the division engineer, and the chief of engineers, not one of those officials, nor any of their authoritative advisors, was called to testify. With respect to the district engineer's level, where the decision had been made to issue the permit without waiting for the results of the Lawler study, the only Corps witness was Linda Monte, a marine biologist who was not one of the decisionmakers. With respect to the division engineer's level, where the decision had been made to issue the permit despite the Lawler study's revelations, the Corps again relied on the testimony of Monte, who had been promoted to the division level in 1980, and called two other witnesses. One was the Chief of the Operations Branch of the Constructions Operations Division, whose testimony consisted chiefly of a skeletal outline of the events at the division level. The other was another biologist. None of the three played any decisionmaking role, and neither the division engineer nor any member of his "Westway Committee" testified. With respect to the chief of engineers, who decided to issue the permit within a month of the elevation of sister agency criticisms to him, the only witness called was a biologist who had no role as a decisionmaker and who was not directly consulted by either the chief of engineers or his principal aide. The court's review was further hampered by "problems of lack of records, lost records, [and] temporarily-lost-and-belatedly-discovered records." August 5 Opinion at 7.

At the Second Trial, at which FHWA's actions were under scrutiny, responsible officials of FHWA testified, but faulty memories (perhaps conveniently blank, *see* 541

F.Supp. at 1372) and helter-skelter record-keeping practices made it difficult to determine the extent of FHWA's responsible supervision of NYSDOT's environmental investigations and disclosures. For example, when the Corps division engineer passed on to FHWA the criticisms of sister federal agencies and asked whether a supplemental EIS was necessary, FHWA referred the question to the Project. Eventually FHWA sent the Corps a letter dated October 9, 1980, advising that no SEIS was necessary, but the provenance of certain misstatements in "Attachment 2" to FHWA's letter was, at trial, problematic. On the first day of his testimony, FHWA Area Engineer Graham Bailey testified repeatedly that NYSDOT had drafted Attachment 2; the next day he testified that he was "absolutely certain" he had drafted it and that the words and thoughts were entirely his own; still later, a document was produced indicating that NYSDOT had given Bailey the precise language that appeared in Attachment 2. No one from NYSDOT or the Project admitted having provided the language.

Given the disclosure and reasoned-record goals of NEPA and the Clean Water Act and the difficulties in assessing the adequacy of the agencies' record development that transpired at the trials below, we conclude that the special provision ordering the agencies to keep records concerning their Westway reconsiderations was permissible and appropriate.

### 2. Lead Agencies

In the April Judgment the district court required, in connection with any renewal of the landfill permit application by NYSDOT, that the Corps prepare a SEIS. *See* Part I.D. *supra.* Shortly thereafter the court was informed that, pursuant to CEQ regulations, FHWA intended to participate in the process of supplementation as a joint lead agency with the Corps. Immediately prior to the start of the trial of plaintiffs' claims against FHWA, the court announced that the April Judgment did not permit the proposed joint-lead procedure:

THE COURT: . . .

. . . .

And I want to state that I will regard it as a violation of the judgment which I entered on April 14th if the FHWA acts as a joint lead agency in connection with the preparation of the Environmental Impact Statement which the Corps of Engineers is now obligated to prepare.

(Second Trial Tr. at 2.) We conclude that this restriction exceeded the court's power and must be vacated.

■ NEPA itself requires that an EIS, if one is necessary, be prepared by a "responsible Federal official." 42 U.S.C. § 4332(2)(C). The statute does not purport to determine what agency is to prepare the EIS when two or more federal agencies are involved in a project. Regulations promulgated by the CEQ, however, contain guidelines for the designation of a lead agency to prepare the EIS on all aspects of a project involving more than one federal agency. Under these regulations, "[t]he agencies themselves are to designate the 'lead' agency . . .," *Natural Resources Defense Council v. Callaway, supra,* 524 F.2d at 86, and are encouraged to consider "the possibility of joint preparation of a statement by all agencies concerned." 40 C.F.R. § 1500.7(b); *see also* 40 C.F.R. § 1506.3. In the present case, the CEQ, whose views are entitled to substantial deference, *see Andrus v. Sierra Club, supra,* advised FHWA and the Corps that "[t]he joint lead agency approach is expressly sanctioned in Section 1501.5 of the CEQ regulations and comports with the overall policy of the regulation . . .," and that the proposal for joint lead in the preparation of the Westway SEIS "is consistent with CEQ regulations."

■ We conclude that the designation of a lead agency or joint lead agencies is a matter committed to agency discretion, and we find nothing in NEPA or the regulations suggesting that the courts may overrule the determination by the agencies that are involved that one or more of them will be lead agency or agencies. Accordingly, we vacate so much of the April Judgment as purports to forbid FHWA to act as joint lead agency in the preparation of a SEIS.

■ This interpretation of the authority of the agencies under NEPA does not, of course, alter the obligations imposed on the Corps by the Clean Water Act. Although FHWA and the Corps may act as joint lead agencies in the preparation of a fisheries SEIS, the Corps will continue to be required under the latter Act to conduct its own investigation in order to reach a decision, on a reasoned administrative record, as to whether to issue the landfill permit.

### 3. *The Special Master*

■ The July Judgment provided for the appointment of a special master to oversee compliance by FHWA and the Corps with the court's directives. As set forth in note 16 *supra,* the special master was given considerable control over the steps to be followed by FHWA and the Corps in their reconsiderations. He was expressly authorized, for example, to require that officials of FHWA and the Corps, and consultants employed by them, meet with him, to require that they prepare reports for his consideration, and to require that they submit draft SEISs for his review. The district court thereafter authorized him to determine, as between FHWA and the Corps, which agency would be allowed to take the lead in preparing the required SEIS. The plaintiffs urged him, *inter alia,* to control the agencies' selection of consultants in the design of environmental studies and to forbid any conversation between the Corps and NYSDOT or its consultants with respect to interpretations of the Lawler data. In all the circumstances, we conclude that the appointment of a special master was not permissible.

Fed.R.Civ.P. 53 allows the court to appoint a special master to ensure compliance with the court's orders. *See Swann v. Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944). Rule 53(b) itself counsels restraint in the use of such masters ("A reference to a master shall be the exception and not the rule."), and the Supreme Court has ruled repeatedly that,

except in the most extraordinary circumstances, the courts may not control the internal operations of federal administrative agencies, *see, e.g., Vermont Yankee, supra,* 435 U.S. at 542–49, 98 S.Ct. at 1210–14; *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

*Vermont Yankee* sets forth the Supreme Court's most recent words of caution against the courts' engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress:

Absent constitutional constraints or extremely compelling circumstances the "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *FCC v. Schreiber,* 381 U.S. [279] at 290 [85 S.Ct. 1459 at 1467, 14 L.Ed.2d 383] quoting from *FCC v. Pottsville Broadcasting Co.,* 309 U.S., at 143 [60 S.Ct. at 441]. Indeed, our cases could hardly be more explicit in this regard. The Court has, as we noted in *FCC v. Schreiber, supra,* at 290, and n. 17 [85 S.Ct. at 1467, and n. 17] upheld this principle in a variety of applications, including that case where the District Court, instead of inquiring into the validity of the Federal Communications Commission's exercise of its rulemaking authority, devised procedures to be followed by the agency on the basis of its conception of how the public and private interest involved could best be served. Examining § 4(j) of the Communications Act of 1934, the Court unanimously held that the Court of Appeals erred in upholding that action. And the basic reason for this decision was the Court of Appeals' serious departure from the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure.

We have continually repeated this theme through the years, most recently in *FPC v. Transcontinental Gas Pipe Line*

*Corp.,* 423 U.S. 326 [96 S.Ct. 579, 46 L.Ed.2d 533] (1976), decided just two Terms ago. In that case, in determining the proper scope of judicial review of agency action under the Natural Gas Act, we held that while a court may have occasion to remand an agency decision because of the inadequacy of the record, the agency should normally be allowed to "exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops." *Id.,* at 333 [96 S.Ct. at 583]. We went on to emphasize:

> "At least in the absence of substantial justification for doing otherwise, a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry and ordering the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency. Such a procedure clearly runs the risk of 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.' *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947)." *Ibid.*

435 U.S. at 543–45 [98 S.Ct. at 1211–12] (footnote omitted). In *Vermont Yankee* and in each of the cases it cited, the procedural restrictions found inappropriately imposed by the courts had been far less intrusive than that in question here, where the special master apparently was to control every detail of every step of the agencies' reconsiderations.[30] *Vermont Yankee, supra* (court orders requiring rulemaking process to include more opportunity for airing of issues and requiring rewriting of an administrative report); *FPC v. Transcontinental Gas Pipe Line Corp., supra* (court order that agency conduct investigation to supplement record); *FCC v. Schreiber, supra* (court order that agency, in conducting proceedings, protect confidentiality of certain testimony and documents); *FCC v. Pottsville Broadcasting Co., supra* (court order that agency's public interest review process proceed on remand on the basis of already-existing record). We do not believe that "extremely compelling circumstances" warranting appointment of a special master exist here.

■ In the present case, the district judge, in an opinion dated August 4, 1982 ("August 4 Opinion"), stated his reasons for believing that this extraordinary relief was warranted. He began the discussion as follows:

> The purpose of appointing a Special Master is to attempt to deal with problems about compliance with the Court's judgments in a timely[a] fashion and to minimize the risk of a second round of lengthy litigation at the end of the remand process.

August 4 Opinion at 4. In like vein he closed this section of his discussion, after having described the course of the Westway project and of the litigation it had spawned, as follows:

---

**30.** According to the motion of FHWA and the Corps in this Court for a stay with respect to the special master, the first order of the special master directed the agencies to submit a "compliance report" and

> to draft "an implementation plan" setting forth in detail the manner in which "the Corps and FHWA propose to comply in the future with the Court's judgments and the Applicable Law."

More specifically, the Special Master ordered the agencies to disclose all procedural steps they planned to take and why such action was justified; to identify all portions of the EIS for which supplementation is proposed; to describe all steps to develop information on topics the district court ordered be examined in the supplement; to describe all steps to evaluate existing fisheries data and all plans to determine whether further fisheries studies should be conducted; to set forth plans for involvement of other federal agencies and of consultants employed by NYS-DOT; to identify plans for the respective roles of the Corps and FHWA; ... to identify all agency personnel and consultants to be employed; and to disclose target dates for all actions.

Thus over a year has been required in the current round of litigation that commenced after the Corps of Engineers granted the landfill permit. How long will be required by the Corps and the FHWA for the remand proceedings ordered by the Court is not now known. But what is most important, particularly in view of the history of the proceedings, is that every effort be made to deal with any problems about compliance with the Court's orders *promptly* and to minimize the risk of another round of substantial litigation at the conclusion of the remand process. This is the reason for the appointment of a Special Master.

*Id.* at 6 (emphasis in original).

We regard the court's concern as to the length of time during which Westway has been under consideration and the duration of the litigation as a wholly inadequate basis for the imposition of such an extraordinary remedy as appointment of a special master. The above authorities teach that it is not the province of the courts to control the "time dimension of the needed inquiry." *Vermont Yankee, supra,* 435 U.S. at 545 [98 S.Ct. at 1212] (quoting *FPC v. Transcontinental Gas Pipe Line Corp., supra,* 423 U.S. at 333 [96 S.Ct. at 583] (quoting *SEC v. Chenery Corp., supra,* 332 U.S. at 196, 67 S.Ct. at 1577)). The timing concerns expressed by the district court simply are not the "extremely compelling circumstances" needed to justify judicial control of administrative agency proceedings.

Of far greater significance is the matter of the bona fides of FHWA and the Corps in their prior consideration of the fisheries issues raised by Westway. In the latter sections of the August 4 Opinion, the court indicated that the appointment of a special master was desirable because of the past failures of the agencies to proceed in subjective good faith with respect to the fisheries issues. Thus, the court stated that the April and July Judgments "do not involve routine remands to agencies which have made honest errors of judgment or have had honest misunderstandings about their legal responsibilities," *id.* at 7, and termed it

a matter of "elementary prudence to guard against a repetition of the prior record of bad faith by appointing a special master," *id.* at 14; *see also id.* at 16.

Of the authorities discussed above, none dealt with instances in which the administrative agency was found to have operated in bad faith. Neither in those cases nor in any other of which we are aware has the nature of the "extremely compelling circumstances" needed to justify judicial interference with agency procedures been discussed with reference to the subjective quality of the agencies' conduct. We think it prudent, before examining the district court's findings of bad faith, to review the general framework within which the courts may normally assess the substance of agency actions. It is elementary that federal administrative agencies are arms of the executive or legislative branches of the government. They have been entrusted with substantive decisionmaking power by Congress. An agency's substantive decisions are largely discretionary and not subject to review by the courts; they must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." APA § 706(2)(A). Thus, there may be instances in which the court disagrees with the agency's assessment of the significance of given facts or data; but the disagreement does not mean that the agency's view was wrong, or even if it was wrong, that the agency's decision based on that view was reached in bad faith. The very concept of discretionary decisionmaking leaves room for divergent sustainable views. With this framework in mind we turn to the district court's findings of bad faith.

Following the Second Trial, the court concluded that FHWA had not acted on a reasonable basis or in subjective good faith when it failed, in light of the Lawler study results, to supplement or correct the FEIS. We set forth below six principal findings discussed in the court's June 30, 1982 opinion, that led to that conclusion.

(A) The [Lawler] information, as gradually obtained by the Project and the

FHWA over a period of many months, was of acute concern because it was totally at variance with what had been set forth in the January 1977 EIS and because it showed that the landfill would eliminate a highly productive fisheries habitat. The Project and the FHWA responded to this circumstance with a plan to delay issuance of the report by [Lawler], and to manipulate the presentation of this data in order to mask its full import.... The decision of the Project and the FHWA not to issue a corrective or supplemental EIS was not taken in good faith reliance upon expert judgment, but was designed to avoid public disclosure of a major environmental impact.

541 F.Supp. at 1372–73.

(B) During the summer of 1980, among the events leading to an August 13 meeting called by the Corps to discuss mitigation, the court found that

Project and FHWA officials fully realized that [the Lawler] data showed that the proposed landfill would eliminate a significant fishery habitat in the Hudson estuary.... The Project devised a strategy to deal with this problem. The Project gave the Division Engineer's office some information, although not complete information, about the results of the [Lawler] study.... It was agreed among the Project, the FHWA and the Corps that, in order to make the issuance of the landfill permit "more defensible" (Pl. Ex. 74), and to defuse the opposition as much as possible, mitigation concepts would be worked out to attempt to compensate for the loss of fish habitat.

*Id.* at 1374.

(C) At an August 20, 1980 meeting attended by officials of FHWA, the Project, and Lawler,

the discussion of the [Lawler] fisheries data and the impact of the proposed landfill was in far different terms from the positions which were later taken officially by the Project and the FHWA. At this meeting, the Project representatives, seconded by [Lawler], told the FHWA that the [Lawler] study indicated that the landfill could cause significant loss of fish population and subsequent adverse effects on the level of future stocks of the species in question in the lower Hudson area.

*Id.*

(D) The agency officials identified by the court as most intimately involved with the Lawler data were Bridwell and Joan Walter, both of Sydec.

The substance and tone of the [Lawler] report were entirely different from what was expressed privately by the Project and [Lawler] at the meeting on August 20....

Bridwell and Walter deny any role in drafting or directing the drafting of the aspects of the [Lawler] report here criticized....

The Court finds that, even if they played no role in the drafting of the [Lawler] report, Bridwell and Walter knew about the misleading nature of the report at the time it was issued.

*Id.* at 1377.

(E) FHWA advised the Corps, by letter dated October 9, 1980, that there was nothing in the Lawler study that warranted a new or supplemental EIS. "Attachment 2" to this letter stated that the "[Lawler] data ... does [sic] not change the [FEIS's] basic conclusion, that is, fish use the area." The court found that "[t]his statement, and indeed the entire description relating to fisheries, was simply fraudulent."

*Id.* at 1379.

(F) As to the authorship of Attachment 2, the court found as follows:

Despite her denials at the trial, it is now clear that Walter participated in the drafting of Attachment 2, for use by the FHWA.... It is difficult to believe that Bridwell did not know of what was being given to the FHWA on this important matter, particularly in view of the fact that the Beveridge &

Diamond memorandum [containing in virtually haec verba the mischaracterization of the FEIS's conclusion on fisheries] was addressed to him. In any event, Bridwell received a copy of the October 9, 1980 letter after it was sent, and read it. The court finds that both Bridwell and Walter knew of the obvious falsity of the letter, and bear a responsibility for drafting or failing to correct it.

*Id.* at 1381.

While we find that the record reflects distressing derelictions by the federal agencies, including a certain amount of bad faith by FHWA, we believe the picture as to those agencies is not quite so unsavory as the above findings depict it. A number of observations serve to place matters in a somewhat different perspective. First, we note that the district court did not find that FHWA had acted in subjective bad faith in the issuance of the original EIS. It was Sydec, leader of the Project and under the aegis of NYSDOT, which drafted the FEIS and which "knew, or should have known, of the lack of factual basis for what was stated." *Id.* at 1372; *see id.* at 1371, 1382. Although FHWA violated its statutory duties by not making its own investigation into the matter, the court did not find that it deliberately closed its eyes to available information or otherwise acted in subjective bad faith at that time.

Second, some of the court's findings of bad faith are undercut by other findings that appear to be inconsistent. For example, item (A) above suggests that FHWA, equally with the Project, obtained the Lawler data as it was generated from April 1979 through April 1980, and responded with a scheme of delay. Although the record indicates that this was true of the Project, it is not so clear as to FHWA, and the court found that as the Lawler data came in, the Project did not keep FHWA fully informed but gave it only some of the information. *Id.* at 1373. Similarly, the attribution to FHWA, in item (B), of full knowledge and scheming in the early summer of 1980 is contraindicated by the

court's findings suggesting that in fact Lawler and the Project first gave FHWA the complete picture on August 20. Item (C) so suggests, as do other portions of the court's opinion:

The evidence about the August 20 meeting demonstrates that both the Project and [Lawler] were fully aware that the proposed landfill would have an environmental impact of substantial significance.... All of this was communicated to the FHWA.

*Id.* at 1376; *see also id.* at 1372–76.

We have somewhat the same problem with the court's conclusion, adverted to in (B) above, that the Corps colluded with FHWA and the Project to avoid publication of an informative SEIS with respect to the fisheries issues. *See also id.* at 1381. In fact the court found that the Corps division engineer had urged that the Lawler report be filed as a supplement to the FEIS. 536 F.Supp. at 1249. The record contains a letter from the division engineer to FHWA making this recommendation and further urging that the Lawler report be circulated to concerned federal agencies and interested public parties. These facts seem inconsistent with the imputed desire to conceal the Lawler report. Moreover, although the court found that the Corps should have known that the Lawler report itself understated the quantities of fish in the interpier area revealed by the Lawler sampling, August 4 Opinion at 10, it also found that the Corps was not provided with all of the Lawler raw data, 541 F.Supp. at 1374; *see also id.* at 1378, and hence the Corps may not have known that the Lawler report was understated. Surely the Corps should have learned that fact, because under the Clean Water Act it should have been making its own investigation; but it is not clear that the Corps's acceptance of the Lawler report was consciously bad faith conduct. Finally, the court seemed critical of the fact that the Corps initiated discussions of mitigation concepts. The court appears to have viewed all mitigation discussions with suspicion, implying that they constituted a devious attempt to avoid disclosures. It does not appear to have made any allowance for

the fact that 33 C.F.R. § 320.4(c) expressly requires the Corps to consider and press for mitigation measures. *See* note 8 *supra.*

With respect to items (C), (D), and (F) above, it seems plain that these are findings of bad faith only on the part of the Project and its employees, not of FHWA. These show that the *Project* officials knew all along the significance of the Lawler data, that the *Project* officials knew those data were not fully disclosed in the Lawler report, and that the *Project* officials provided FHWA with the fraudulent characterization of the FEIS that was used to dissuade the Corps from issuing a SEIS. The role of FHWA in these endeavors appears to have been largely passive. As to item (E), describing FHWA's October 9, 1980 letter to the Corps misrepresenting the conclusion of the FEIS on the presence of fish in the interpier area, while obviously FHWA should have taken care to avoid such a blatant misrepresentation, it appears that it may simply have relied on the Project and Sydec, as it had in the past, to supply it with information and documents to be forwarded to the Corps.

In our view the record amply supports the district court's findings of bad faith on the part of the Project and its officials. We are also inclined to agree that FHWA became fully aware on August 20, 1980, that the Lawler data provided substantial ground for believing that the Westway landfill would have a significant impact on fisheries and that FHWA thereafter proceeded in bad faith, at least in failing to disclose pertinent data to the Corps.[31] We also concur in the district court's inference that the Project's machinations to avoid disclosure of the Lawler data suggested that in the Project's view the data were highly significant rather than insignificant, and we agree that the same inference is permissible as to FHWA's assessment of the data in light of its joining ranks with the Project in preventing disclosure.

Yet we are troubled by the court's findings of bad faith on the part of the Corps and of pre-August 20, 1980 bad faith on the part of FHWA. Some of these, as discussed above, are weakened by other findings that subvert the factual premises of the conclusion of bad faith. In other instances, the court has characterized as bad faith what may well have been the results of incompetence, lack of diligence, or a different evaluation of the data. For example, in its August 4 Opinion the court listed as an instance of concealment the district engineer's August and September 1979 reports which reiterated the FEIS and Water Report theses of biological impoverishment and concluded that the loss of the interpier area would have no significant effect on fish resources. The court stated that these reports made "findings of fact on the subject of fisheries . . . based upon information known to be obsolete and incorrect." August 4 Opinion at 8. This presumably refers to the finding in the court's March 31 opinion that "preliminary data" from the Lawler study "indicating the presence of significant marine life in the interpier area" had already been given to Monte informally, and hence that the August and September 1979 reports did not represent the facts as they existed. 536 F.Supp. at 1243. Yet the court also found that the periods of greatest abundance of striped bass—the focal point of the court's criticisms—were April 1979, and October 1979 through April 1980. *Id.* at 1245. Thus, by the time of the August and September 1979 reports, the vast bulk of the most important data had not yet been gathered. Hindsight reveals the significance of the data then on hand; greater competence might have led to a different evaluation of that data at the time; and greater diligence and prudence would surely have dictated waiting for further data. But it is not clear to us that the decisions that were made at the district

---

**31.** At trial FHWA took the position that it had viewed the Lawler data as revealing an unexpected number of fish in the interpier area, but that it did not believe the landfill would have a significant impact since the fish could spend the winter on the New Jersey side of the Hudson.

engineer's office were made in subjective bad faith.[32]

In expressing these reservations, we do not mean to suggest that any of the district court's imputations of bad faith is clearly wrong. Rather, we believe that where imputations of bad faith are to be the basis for such intrusive judicial control over administrative reconsideration of matters committed to agency discretion, the conclusions of bad faith should be consistently supported by the court's subsidiary findings, and the findings should present a clear and convincing picture of such pervasive bad faith as to suggest that, absent judicial supervision, the agency probably will not obey an injunction detailing its obligations.

Instead of presenting a panorama of unremitting bad faith conduct, the record suggests to us that virtually all of the early derelictions of FHWA and the Corps, as well as some of their later failures, may to a great extent be attributable to a willingness on the part of the agencies to sit back and allow others to do work entrusted to them, without bestirring themselves to develop accurate data. The Corps repeatedly shunted off fisheries questions to FHWA and NYSDOT; FHWA similarly seemed content to quote representations given to it by the Project.

■ The April and July Judgments seek to put an end to such unauthorized and unwarranted reliance on the interested party, NYSDOT, to perform objective evaluations for which FHWA and the Corps are responsible. The injunctions require those agencies to make their own independent evaluations, and it does not seem improbable that the injunctions, together with the record-keeping requirements that have been imposed, will have the desired effect of ensuring that the agencies will carry out the responsibilities entrusted to them by law. The fact that officials of the agencies have in the past been willing to ignore the statutory requirements does not make it probable that they will risk being held in contempt for failing to obey the court's injunctive orders. It is of course possible to envision a recurrence of the bad faith performance of the agencies. But, as the Supreme Court pointed out in *FCC v. Pottsville Broadcasting Co., supra,*

> [i]t is always easy to conjure up extreme and even oppressive possibilities in the exertion of authority. But courts are not charged with general guardianship against all potential mischief in the complicated tasks of government. The present case makes timely the reminder that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. Ry. Co. v. May,* 194 U.S. 267, 270 [24 S.Ct. 638, 639, 48 L.Ed. 971]. Congress which creates and sustains these agencies must be trusted to correct whatever defects experience may reveal. Interference by the courts is not conducive to the development of habits of responsibility in administrative agencies.

309 U.S. at 146, 60 S.Ct. at 443.

In sum, we are persuaded by (1) the fact that the court may review only whether the proper NEPA procedures were followed and whether a reasoned record for a decision has been created, (2) the highly intrusive nature of the mandate given the special master, (3) the entry of injunctive provisions compelling the federal agencies themselves to make the required investigations and analyses, (4) the entry of an unusual, but appropriate, order requiring record-keeping with respect to all aspects of the

---

**32.** Monte testified at the First Trial (she did not testify at the Second Trial) that at the time she drafted the reports in question it was her view, based in part on the Water Report and in part on another study she had reviewed in connection with a different landfill permit application, that the interpier area was impoverished with regard to both the variety and the quantity of species normally to be found in a littoral area. Despite the court's later criticisms of these reports, we note that at the close of the First Trial the court had gone out of its way to commend all of the witnesses for their candor:

THE COURT: I want to say I think there is an honest conflict and I think the witnesses were admirable. They were candid and expressed candid views and I think all the witnesses from beginning to end, the Corps and everybody else, were just remarkably candid.

(First Trial Tr. at 1496.)

agencies' reconsiderations on remand, and (5) the absence of any prior contemptuous behavior of these agencies toward orders of the court, that the court should not have appointed a special master.

We therefore vacate that portion of the July Judgment. In so doing, we do not foreclose the possibility that such extraordinary relief may become permissible and appropriate if FHWA or the Corps violates the terms of the injunctions entered by the court.

## IV. CONCLUSION

We affirm the April and July Judgments to the extent that they (1) held FHWA to have violated NEPA, (2) held the Corps to have violated NEPA and the Clean Water Act, (3) enjoined further action with respect to Hudson River landfill unless and until FHWA and the Corps reconsider the matter of impact on fisheries in accordance with NEPA and the Clean Water Act, (4) required FHWA, the Corps, and others to maintain records in connection with their reconsiderations of fisheries impacts, and (5), except as indicated hereafter, granted relief to implement the foregoing. We reverse the April Judgment to the extent that it upheld plaintiffs' claim that the Corps had violated the Rivers and Harbors Act. We vacate so much of the April and July Judgments as required that the SEIS include updated information on issues other than fisheries impacts and prohibited FHWA and the Corps from acting as joint lead agencies in the preparation of a SEIS. Finally, we vacate so much of the July Judgment as provided for the appointment of a special master.

Plaintiffs may recover their costs from NYSDOT.

